**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-10277

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER MARTINEZ, RAUL OROZCO,
CANDELARIO MARTINEZ, RAUL MARTINEZ,
aka Roy Reyes Martinez, RAMON PERALEZ GOMEZ,
aka Ray Gomez, CHRISTOPHER BOATRIGHT,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Texas

August 18, 1998

Before KING, SMITH and STEWART, Circuit Judges.

STEWART, Circuit Judge:

This appeal arises from an alleged conspiracy to distribute marijuana and cocaine in Texas and several other states. On appeal from their convictions and sentences, defendants-appellants argue that (1) the evidence was insufficient to convict certain defendants; (2) the district court abused its discretion in controlling the scope of defense counsels' cross-examination of government witnesses; (3) the prosecution failed to disclose impeachment information concerning government witnesses in a timely fashion; (4) the district court abused its discretion in permitting a Drug Enforcement Administration agent's testimony regarding the chain of custody of seized drugs; (5) the prosecution improperly commented on the defendants' decision not to testify; (6) certain defendants received ineffective assistance of counsel; (7) the district court erred in its instructions to the jury; and (9) the

district court incorrectly sentenced certain defendants. For the reasons assigned, we AFFIRM the decision of the district court.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from an alleged conspiracy to distribute marijuana and cocaine. The government contends that Christopher Martinez ("Christopher") obtained bulk quantities of marijuana and cocaine on consignment from appellants Ramon Peralez Gomez and Raul Orozco. Christopher supposedly distributed the marijuana and cocaine to appellants Candelario Martinez, Raul Martinez, and Christopher Boatright, among other individuals, for further distribution in Texas, Oklahoma, Virginia, and elsewhere. The drugs and money derived from these sales and distributions were stored at the residences of Christopher and Boatright. Christopher allegedly used the income from his drug distribution enterprise to pay Gomez and Orozco for the drugs that they supplied.

The government established its case against the appellants through the cooperation of several government witnesses, but mainly through that of Stewart Porter—a private pilot who was previously involved in drug dealing with Christopher. Porter agreed to cooperate after police told him he would not be prosecuted for his own drug activities if he cooperated in the investigation of Christopher.

Porter provided considerable evidence about the drug trafficking activities of Christopher and the other appellants. Much of his knowledge stemmed from the fact that he piloted Christopher on several trips and also piloted flights to deliver drugs and money at Christopher and the other appellants' direction. On several such flights, Porter witnessed Christopher make deals with certain individuals to distribute his cocaine in periodic shipments. On one trip, Christopher met with Orozco and the two appellants agreed that Orozco would provide drugs on consignment and that Porter would fly the payments for the drugs to Orozco. After the deal was struck, Porter made numerous flights to deliver the payments from Martinez to Orozco. These payments ranged from $30,000 to $180,000.

On April 20, 1995, Christopher gave $226,000 to Elgin Allen (aka Allen Hammer), a Dallas disc jockey, to purchase 15 kilograms of cocaine in Dallas. It so happened that Allen made such

purchase from undercover police officers. Allen was arrested as a result of the purchase. After Allen was released on bail, Christopher provided him money for attorney's fees. After Allen's conviction and sentencing, he testified for the government at the appellants' trial. In addition to the government's use of the aforementioned "informants" to expose the drug trafficking ring, Christopher was tape-recorded discussing his drug business—mentioning 400 and 600 "keys" (kilograms of drugs), and noting that 400 kilograms was worth $4 million. On August 1, 1995, Porter and Boatright had a tape-recorded conversation about drug trafficking.

Porter provided agents with information which led to the October 3, 1995 discovery of 90 pounds of marijuana during a warrant search of the residence of Candelario Martinez (Christopher's brother-in-law) and Raul Martinez (Christopher's brother). Orozco allegedly was the source of the marijuana. During the search, officers seized drug paraphernalia, an accounting book for drug transactions, and two receipts from Christopher for $3,000 each.

A November 16, 1995 search of Christopher's residence pursuant to a warrant resulted in the discovery of $514,711 in cash drug proceeds as well as drug paraphernalia, drug trafficking records, and a small amount of marijuana. Porter verified that prior to the search he had seen Christopher wrap the cash proceeds in bundles of $10,000 and that the two had discussed the anticipated returns from drug distribution transactions with Gomez. Following the search, Christopher told Porter that just prior to the search, he had become concerned that his house was under surveillance and had directed one of his "employees" to remove from the property a vehicle containing ten kilograms of cocaine. A set of drug notes seized during the search referred to five kilograms of cocaine for the price of $16,500 each (presumably $16,500 per kilogram).

On February 27, 1996, appellants Christopher, Candelario Martinez, Raul Martinez, Boatright and two others attempted to burn a residence in Arlington, Texas that was owned by a person who had not paid money he owed to Christopher for a consignment of ten kilograms of cocaine. Members of this group made "Molotov cocktails" from Coke bottles, gasoline, and rags in furtherance of their plan.

**3**

On June 18, 1996, an indictment was returned charging all six appellants (and three other codefendants) with conspiracy to distribute cocaine and marijuana, in violation of 21 U.S.C. §846; charging appellants Christopher (three counts) and Orozco (one count) with money laundering, in violation of 18 U.S.C. §1956(a); and seeking criminal forfeiture against Christopher and Orozco (and one other codefendant), under 21 U.S.C. §853. On June 25, 1996, five of the six appellants (all except Orozco) were arrested. On September 3, 1996, Orozco was stopped for a traffic violation. The officers discovered that there was an outstanding federal warrant for Orozco for drug distribution and arrested him.

After a five-day jury trial, all appellants were convicted on all of the aforementioned counts.[1] The district court sentenced Christopher to life imprisonment and criminal forfeiture of $770,711; Orozco to 168 months imprisonment, criminal forfeiture of $19,900 and a fine of $25,000; Candelario Martinez to 235 months imprisonment; Raul Martinez to 262 months imprisonment and a fine of $25,000; Gomez to 262 months imprisonment; and Boatright to 168 months imprisonment. These appeals followed.

## DISCUSSION

## I

The first issue that appellants raise in their briefs is whether there was sufficient evidence to prove the drug trafficking conspiracy charge against Orozco and the money laundering charges against Orozco and Martinez. Review for sufficiency of the evidence is decidedly narrow—a conviction must be affirmed if a rational trier of fact could have found that the evidence established the essential elements of guilt beyond a reasonable doubt. United States v. Mmahat, 106 F.3d 89, 97 (5th Cir. 1997). The evidence is viewed in the light most favorable to the verdict and this court indulges all reasonable inferences in favor of the verdict. Id. This circuit has noted that "[w]hen reviewing the sufficiency of the evidence to support a conviction, the facts and all reasonable

---

[1]Codefendants Esmerelda Mart inez (Christopher's wife), David Macias, and Juan Alfredo Martinez (relationship to Christopher, if any, is not established in the record) were acquitted by the jury.

inferences therefrom will be viewed in the light most favorable to the court's findings." United States v. Garcia, 917 F.2d 1370, 1376 (5th Cir. 1990) (internal citations omitted).

Appellant Orozco contends that there was insufficient evidence to prove his membership in the drug trafficking conspiracy. The record reveals that Porter's testimony at trial established that 1) Orozco entered into an agreement with Christopher to supply Christopher with cocaine on consignment for further distribution and 2) Porter made no fewer than nine flights to deliver approximately $700,000 in cash payments for cocaine to Orozco. We find that such evidence is sufficient to prove membership in a drug conspiracy. Moreover, as the government urges, Porter's testimony was corroborated by entries in his flight log and his credibility was also supported by tape recordings and surveillance.

The jury is entitled to believe a witness unless the testimony is so incredible that it defies physical laws. United States v. Lerma, 657 F.2d 786, 789 (5th Cir. 1981), cert. denied, 455 U.S. 921 (1982). Further, the evidence does not have to exclude every reasonable hypothesis of innocence. United States v. Leed, 981 F.2d 202, 205 (5th Cir. 1992), cert. denied, 113 S.Ct. 2971 (1993). The jury's reasonable determination that Porter was a credible witness cannot be disturbed on appeal. United States v. Westbrook, 119 F.3d 1176, 1190 (5th Cir. 1997) (asserting deference to jury assessment's of credibility). In United States v. Morgan, 117 F.3d 849, 854 n. 2 (5th Cir. 1997), this court noted that "[c]redibility issues are for the finder of fact and do not undermine the sufficiency of the evidence." (Internal citations omitted).

Christopher and Orozco challenge the sufficiency of the evidence to prove that the money involved in the three money laundering transactions was the proceeds of drug trafficking and that the transactions furthered drug trafficking operations. The appellants claim that the district court misconstrued the elements necessary to sustain a money laundering conviction under 18 U.S.C. §1956 and erroneously equated drug purchase money with disposing of unlawful proceeds (money laundering).

The evidence offered at trial indicated that virtually all the money that Christopher possessed

was drug money and that the transactions he entered were conducted with the intent to promote the drug trafficking operation. It is the intent to promote the illegal activity, the government argues, that is the decisive element of the money laundering statute. It is clear from the evidence that Orozco knew that Christopher took drugs on consignment and paid for them with money raised from the distribution of the drugs. We agree with the government that from the evidence presented at trial, the jury could readily infer that the substantial amounts of $226,000 and $20,000 involved in Counts 2 and 4, respectively, were knowingly acquired by Christopher in whole or in part from drug trafficking. We find appellants' argument that the drug proceeds were not used to further illegal activities unconvincing. The evidence indicates that illegal proceeds were used to further illegal activities in the instant matter. Because the jury found such evidence convincing, we will not overturn its finding.

## II

Appellants Orozco and Boatright argue that the district court abused its discretion in controlling the scope of defense counsels' cross-examination of government witnesses. Orozco's argument focuses on the district court's "constant interruption" of his attorney during cross-examination, while Boatright's argument centers on the rather nebulous "inability" to cross-examine Drug Enforcement Administration chemist Ann Castillo. While conceding that the district court regulated cross-examination firmly, the government asserts that the district court acted in a fair manner and in accordance with Fed. R. Evid. 611(a).

The district court limited appellants' cross-examination of government witnesses in several respects including: 1) permitting only one defense counsel to examine a cooperating government witness concerning any benefits he would receive for his testimony; 2) confining cross-examination to the scope of the direct examination; and 3) barring repetitive questions. Defense counsel and the jurors were told at the outset of the trial that cross-examination was to be conducted in such manner and the jury was cautioned not to construe against a defendant the fact that his counsel did not ask the same question that had been asked by another defense counsel previously.

A district court's restrictions on cross-examination are reviewed for clear abuse of discretion. United States v. Bryant, 991 F.2d 171, 175 (5th Cir. 1993). Under Fed. R. Evid. 611(a), the district court may exercise reasonable control over the method of interrogating witnesses. This court has held that Rule 611(a) provides the district court with wide latitude to impose reasonable limits on cross-examination subject to the Sixth Amendment requirement that sufficient cross-examination be permitted to expose to the jurors facts from which they can draw inferences relating to the reliability of witnesses. United States v. Restivo, 8 F.3d 274, 278 (5th Cir. 1993), cert. denied, 613 U.S. 807 (1994). In order to show an abuse of discretion related to the limitations placed on cross-examination, a defendant must show that those limitations were clearly prejudicial. Id.

Appellants do not demonstrate that the aforementioned limitations were clearly prejudicial. Though Orozco insists that his counsel was improperly interrupted and censured during his questioning, he makes no showing that by holding his counsel to pre-established limitations the court prejudiced Orozco himself. Thus, if there was any error to Orozco, the government correctly concludes that it was harmless. The government does not specifically respond to Boatright's contentions. Because Boatright's arguments are rather ambiguous, we conclude after closely reviewing the record that his claims are devoid of merit.

**III**

Appellant Boatright urges that the prosecution failed to disclose impeachment evidence in a timely manner. Boatright suggests that such withheld evidence included: 1) documentation relating to Stewart Porter's drug use and 2) documentation from government informant Michael Rodriguez detailing the conspiracy in which Boatright's name did not appear. Boatright insists that such documents were revealed well after the trial commenced. Asserting that the failure to disclose these items amounts to prosecutorial misconduct, Boatright invites this court to find that a Jencks Act violation occurred and his conviction should thus be reversed. Boatright further suggests that the withheld information was exculpatory in nature.

Whether disclosures of impeachment information violate any constitutional or statutory right

7

of the defendant is determined as a question of law. <u>East v. Scott</u>, 55 F.3d 996, 1002 (5th Cir. 1995).

This court reviews questions of law de novo. <u>In the Matter of Taylor</u>, 132 F.3d 256, 259 (5th Cir. 1998).

The Jencks Act provides, in pertinent part, that:

> After a witness called by the United States has testified on direct examination, the court shall, *on motion of the defendant*, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500 (emphasis added). The Jencks Act does not require production of a witness' statement until after the witness has testified on direct examination. <u>United States v. Neal</u>, 27 F.3d 1035, 1049 n. 26 (5th Cir. 1994), <u>cert. denied</u> 513 U.S. 1179 (1995). With regard to matters that are not exculpatory or impeaching, there is no requirement that the government provide open-ended disclosure of its files. <u>United States v. Agurs</u>, 427 U.S. 97, 109 (1976); <u>United States v. Johnson</u>, 872 F.2d 612, 619 (5th Cir. 1989). Further, there can be no due process violation "[i]f the defendant received the material in time to put it to effective use at trial." <u>United States v. McKinney</u>, 758 F.2d 1036, 1049-50 (5th Cir. 1985). The district court in the instant specifically found that "[n]o defendant has made any showing that exculpatory or mitigating evidence was withheld from him."

Having reviewed the record, we find no indication that information was withheld from Boatright's counsel or that he was not afforded a meaningful opportunity to use it at trial. Boatright does not point to any specific information that he did not receive in time to use during cross-examination, nor does he indicate any prejudicial violation. Though we do not find that a Jencks Act violation occurred with regard to Boatright, we reiterate this circuit's holding that:

> the government's failure to comply with the Jencks Act does not per se require a new trial. In <u>Goldberg v. United States</u>, [425 U.S. 94, 111, 96 S.Ct. 1338, 1348, 47 L.Ed.2d 603 (1967)] the court said that, if the error was harmless, a new trial would not be required. It elaborated what it meant: Since courts cannot "speculate whether (Jencks material) could have been utilized effectively" at trial, . . . the harmless-error doctrine must be strictly applied in Jencks Act cases . . . .

<u>United States v. Beasley</u>, 576 F.2d 626, 629 (5th Cir. 1978). We reject Boatright's Jencks Act

**8**

claims.

## IV

Appellants Orozco, Candelario Martinez, Raul Martinez, Gomez, and Boatright argue that Drug Enforcement Administration ("DEA") chemist Ann Castillo's testimony and her claim of Fifth Amendment privilege on cross-examination violated their rights under the Confrontation Clause of the Sixth Amendment.

Castillo was called by the prosecution for the limited purpose of testifying to the chain of custody of a government drug exhibit. The government claims that it was known before her testimony that she would claim her Fifth Amendment privilege if the defense attempted to impeach her on cross-examination regarding her misconduct in other matters. While allowing Castillo's invocation of the Fifth Amendment, the court nonetheless permitted defense counsel to admit into evidence a deposition which included Castillo's admission of the misconduct. Thus, the government suggests that the invocation of the Fifth Amendment privilege was somehow "balanced" by the opportunity for the defense to present to the jury the incriminating aspects of Castillo's deposition.

The scope of cross-examination is within the province of the trial judge and is to be reviewed only for abuse of discretion. <u>Restivo</u>, 8 F.3d at 279. To demonstrate such an abuse, appellants must show that the limitations imposed upon their counsels' cross-examination were clearly prejudicial. <u>Id.</u> (internal citations omitted). Once again, the appellants have failed to demonstrate that such clear prejudice occurred. Because the chain of custody testimony offered by Castillo did not provide the basis for their conviction in the manner that the testimony of Porter or Allen may have, appellants' argument that their constitutional rights were violated is not supportable. Moreover, the record amply demonstrates that Castillo's deposition acknowledging misconduct provided defense counsel with the ammunition it sought to impeach her credibility before the jury. We thus reject the claims of impairment of their Sixth Amendment right to confront Castillo.

## V

Appellants Orozco, Candelario Martinez, Raul Martinez, and Gomez suggest that certain statements made by the prosecution constituted improper comments on their decision not to testify. During closing arguments, defense counsel argued that Ms. Castillo was not credible because she had engaged in official misconduct and claimed her Fifth Amendment privilege at trial. The prosecutor then stated,

> You know, they talk about inconsistencies and things that might bother you. We've heard emotional speeches about they have a constitutional right to remain silent and it's valuable to protect people against all these accusations and things. But at the same time you've been told that, "Here's Ann Castillo, and you shouldn't believe her because she's been accused."

Defense counsel objected, arguing that this was a comment on defendants' silence. The district court disagreed, but nonetheless provided a curative instruction to the jury as follows:

> Well, I didn't take that as being a comment, but if there was any such comment, of course, the jury will disregard that. . . . [I]f any such comment was made, [the objection] was sustained, and I instruct the jury to disregard it.

Appellants note that the Supreme Court has held that the Fifth Amendment forbids either comment by the prosecution on the accused's silence or instruction by the court that such silence is evidence of guilt. Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). This includes both direct and indirect references to a defendant's silence. United States v. Bright, 630 F.2d 804, 825 (5th Cir. 1980). Appellants suggest that because none of the defendants testified at trial, there is a high probability that the prosecutor's statement influenced the jury verdict. They insist that the district court's instruction that the jury disregard such statement was not sufficient to cure the harm that occurred.

Whether a prosecutor's argument is an impermissible comment on the defendant's right not to testify, and the efficacy of the curative instruction, is reviewed de novo. United States v. Johnston, 127 F.3d 380, 396 (5th Cir. 1997). "The test for determining whether a prosecutor's remarks constitute a comment on a defendant's silence is a twofold alternative one: (1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character

of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." United States v. MacKay, 33 F.3d 489, 495 (5th Cir. 1994). The prosecutor's statement in the instant matter did not satisfy either prong of this test. Taken at face value, the prosecutor's comments do appear to reflect upon the defendants' decision not to testify, but—as the government argues on appeal—instead embrace appellants' argument that an accused has a right not to testify against himself. The prosecutor did not direct the jury to draw any conclusion from the defendants' decision not to testify, but merely suggested that Ms. Castillo's own decision should be respected in a similar manner. The obvious purpose of the curative instruction was to direct the jury to disregard any implication that could be understood as a disparagement of defendants' election to remain silent. Based on these facts, this court cannot determine that the district court plainly erred in its actions. We find that appellants' argument is unpersuasive.

## VI

Prior to trial, the government gave notice of forfeiture to Christopher and his wife, Esmerelda, regarding the $514,711 found in their home. The form contesting the government's forfeiture apparently bore signatures of both Christopher and Esmerelda Martinez, but Mrs. Martinez's counsel sought to prove that Christopher had signed for his wife without her knowledge or consent. This effort to demonstrate her lack of involvement in her husband's drug transactions was part of Mrs. Martinez's overall defense strategy. Christopher's counsel agreed it was "undisputed" that the form did not bear Mrs. Martinez's signature when counsel sent it to Christopher in jail. Mrs. Martinez's counsel sought to have Christopher's counsel testify to these facts. The court ultimately put Christopher's counsel to the choice of stipulating to these facts or testifying as to them. Counsel refused to stipulate and was forced to testify over objection. Christopher asserts that the district court's requirement that defense counsel testify at trial created a conflict of interest that constituted ineffective assistance of counsel in violation of his Sixth Amendment rights. He further argues that the district court denied him a fair trial by forcing his counsel to choose between stipulating or testifying. To establish a claim of ineffective assistance of counsel, appellant must show

**11**

that counsel's performance was deficient and that the deficiency prejudiced the defense to the extent that the result would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984). Demonstrating ineffective assistance of counsel by showing an actual conflict of interest requires that appellant make a showing "that his attorney labored under an actual conflict which adversely affected his lawyer's performance." Portillo v. Johnson, 79 F.3d 441, 447 (5th Cir. 1996). A lawyer testifying during the trial of his client does not constitute a per se conflict of interest, but instead must be evaluated under the "totality of the circumstances" to determine whether an actual conflict exists between the interests of the lawyer and client. Uptain v. United States, 692 F.2d 8, 10 (5th Cir. 1982).

The government makes a sound argument when it urges that Christopher has failed to show that his counsel had divided loyalties and that he operated pursuant to an actual conflict as a result. We find that the decision for counsel to testify rather than enter into a stipulation was a tactical choice that can be construed as a waiver of any conflict claim. Moreover, defense counsel's election to testify did not prejudice Christopher in any significant manner. This case does not involve representation of multiple defendants by one attorney and Christopher does not assert any basis for his counsel to have a conflicting self-interest that would force him to ignore or undermine the interests of his client.

Conflict of interest can also occur if counsel offers significant testimony against his client. Here, counsel testified to undisputed facts and his testimony did not contribute significantly to Christopher's conviction for drug trafficking. The government therefore asserts that no prejudice occurred because of counsel's testimony. While it is a general rule in this circuit that a party's attorney should not be called as a witness unless his testimony is both necessary and unobtainable from other sources, United States v. Crockett, 506 F.2d 759, 760 (5th Cir. 1975), it is also the case that where a lawyer's testimony does not actually incriminate his client, there is no Sixth Amendment violation. Id. at 761.

We find that Christopher mistakenly relies upon cases in which attorneys testified against

**12**

clients in order to exculpate their own criminal liability. See United States v. Ellison, 798 F.2d 1102, 1107 (7th Cir. 1986), cert. denied, 479 U.S. 1038 (1987). In the instant matter, there does not appear to be the suggestion that Christopher's lawyer was implicated in any wrongdoing. Thus, such cases do not apply.

Christopher does not demonstrate, nor does the record reveal any actual conflict or actual prejudice that might persuade this court to sustain his ineffective assistance of counsel claim. Accordingly, we find no error on the part of the trial court.

## VII

During trial, two items unrelated to the case were erroneously handed over to the jury —a bag containing a white, powdery substance and a small plaid case. These items were given to the jury along with other items proper for consideration in the case. The court was made aware of the jury's exposure to the items when, after the jury had begun deliberations, it sent a note to the court inquiring about the relevance of the packet of white, powdery material. The judge proposed the following note be given to the jury in response to its inquiry, and the response was provided without objection:

> In answer to your note, please be advised that the item to which you referred in your note was inadvertently included among the exhibits in this case. It is not an exhibit in this case and it has nothing whatsoever to do with this case. It is an exhibit that was inadvertently put with the exhibits in this case. You should not take the item into account in any respect in your deliberations.

Later the same day, the jury sent a note inquiring about the plaid case to which the judge sent a response nearly identical to that regarding the white substance.

Candelario Martinez, Raul Martinez, Gomez, and Boatright argue that the district court committed reversible error by failing to conduct an evidentiary inquiry following the jury's exposure to the items and abused its discretion by denying appellants' motion for new trial based on such failure. Appellants suggest that the jury was clearly prejudiced by the extrinsic evidence both because the bag containing the white substance mistakenly bore a label with the same case number as the other exhibits in evidence and the jury sent a note requesting specific information regarding the bag of white powder as well as the plaid case. The apparent conclusion, note appellants, was that the white

**13**

powder was cocaine.

This court has held that "[w]here a colorable showing of extrinsic influence appears, a court must investigate the asserted impropriety . . .". United States v. Sanchez-Sotello, 8 F.3d 202, 212 (5th Cir. 1993) (internal citation omitted). Appellants posit that "a defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room 'unless there is not reasonable possibility that the jury's verdict was influenced by the material that improperly came before it.' " United States v. Luffred, 911 F.2d 1011, 1014 (5th Cir. 1990) (internal quotation omitted). This rule creates a rebuttable presumption of prejudice to the defendant, and the "government has the burden of proving the harmlessness of the breach." Id. Appellants further insist that they did not waive this point of error as the government suggests, but note that the district court had an affirmative duty to investigate the extrinsic influence. Sanchez-Sotello, 8 F.3d at 212.

The government contends, and we agree, that the court was under no affirmative duty to conduct a factual inquiry as the two items were clearly not exhibits in the case, the court sent clear instructions to this effect, and the jury's notes reveal that neither item was considered during deliberations. The government further asserts that appellants failed promptly to request a factual hearing or object to the content of the court's responses. It also notes that because appellants' motions for new trial did not demonstrate any way in which the disregarded items could have affected the jury verdict, the district court was correct to deny such motions.

Appellants rely on the Sanchez-Sotello decision, in which the court ordered an investigation of extrinsic influences in the form of one juror's comments about the case to another. While they argue that extrinsic physical evidence should be treated no differently than juror's comments, the issue truly turns on the material and prejudicial impact of the physical evidence as the Luffred court held. We find that the appellants have not made any showing that the jury was likely misled or in any way influenced by the items erroneously placed in the jury room. Because no such showing of extrinsic influence was made, the court was under no duty to investigate the alleged influence. We thus reject appellants' argument.

**14**

## VIII

Christopher claims that he received ineffective assistance of counsel at sentencing because his attorney continually sought withdrawal from the case during the time the Probation Office was compiling its Presentence Report (PSR). Christopher alleges that his attorney "forbade" the Probation Office from interviewing him (Christopher) and that his attorney never provided any information regarding sentencing to Probation. At sentencing, Christopher's counsel offered several objections to the PSR, including objections to the credibility of witnesses on which the drug-quantity calculation was based. Counsel failed, however, to offer any evidence in support of those objections, apart from his efforts at trial to discredit the government's witnesses. Christopher argues that such failure constituted ineffective assistance of counsel.

The district court's fact-finding at sentencing is reviewed for clear error. United States v. Morgan, 117 F.3d 849, 859 (5th Cir., 1997), cert. denied, 118 S.Ct. 454 (1997). Based on facts established in the record, a claim of ineffective assistance of counsel is resolved de novo, although it must be raised on collateral review if it relies on facts not fully developed in the record. United States v. Chavez-Valencia, 116 F.3d 127, 133-34 (5th Cir. 1997). Arguing that defense counsel's decision was a tactical one, the government contends that it cannot support an ineffective assistance claim. United States v. Green, 116 F.3d 1115 (5th Cir. 1997). It further notes that Christopher was sentenced on the basis of the PSR's calculation that his offense conduct involved 706.1 kilograms of cocaine and 328.5 kilograms of marijuana and that these quantities were based on the trial testimony of government witnesses—Porter, in particular. This calculation resulted in a base offense level of 38, which was enhanced two levels for the firebombing associated with the drug trafficking and four levels for Christopher's leadership role in the conspiracy. The resulting level was 44, which is limited by the Sentencing Guidelines to a total offense level of 43. Based on this offense level and Christopher's criminal history category III level, the applicable guideline range is life imprisonment. Christopher does not suggest any specific evidentiary submission that would have aided his argument and it would appear that there was nothing further defense counsel could do for his client.

15

Christopher also argues that the district court violated due process of law by imposing a sentence of life imprisonment based on his offense conduct when only approximately 40 kilograms of marijuana was actually seized by government authorities in connection with his drug operation. The government argues in response that a defendant convicted of a drug trafficking conspiracy is responsible for the quantity of drugs involved in the conspiracy that was reasonably foreseeable by him. U.S.S.G. §1B1.3(a)(1)(B); United States v. Garza, 118 F.3d 278, 286 (5th Cir. 1997).

Because the drug conspiracy involved the total quantity of drugs, it is irrelevant what quantity was actually seized by law enforcement officers or what quantity was alleged in the indictment. Drug quantity is a sentencing factor and is not an element that must be alleged in this indictment. United States v. Castillo, 77 F.3d 1480, 1486 (5th Cir. 1996). Thus, the government is correct in its argument that a penalty based on conduct that was an element of the offense of the conviction cannot violate a defendant's due process rights. We find that Christopher's claim fails.

Additionally, Orozco maintains that the trial court erred in imposing a $25,000 fine as a condition of his sentence. He claims that his PSR substantiates his indigent status and makes no recommendation concerning his ability to pay a fine. He further asserts that he does not have the resources to pay such a significant fine. Orozco notes that in United States v. Fair, 979 F.2d 1037, 1041 (5th Cir. 1992), this court urged the district court on remand to reconsider the appellant's indigence as well as other factors in determining whether it was appropriate to impose a $20,000 fine. The government notes that the Sentencing Guidelines provide a fine range of $17,500 to $175,000 for Orozco's offense level and that the actual $25,000 fine imposed was a modest one. Further, the government points out that the district court, recognizing that the fine might not be readily payable, designed a payment plan for Orozco.[2]

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except

---

[2]The trial judge ordered the $25,000 payable immediately, but also ordered that if the fine had not been paid by the beginning of Orozco's supervised release, Orozco would make payments of $300 per month on all unpaid amounts beginning 60 days after his release from prison until the fine was paid off in full.

where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. §5E1.2(a). District courts are to determine the fine using the criteria set forth in the Guidelines, including "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources[.]" U.S.S.G. § 5E1.2(d)(2). The Fair court noted that "[i]t is undisputed that the guidelines place the burden of proving an inability to pay a fine squarely on the defendant. Fair, 979 F.2d at 1041 (internal citations omitted). The government asserts that Orozco did not meet his burden of establishing inability to pay because he did not provide complete financial information to the Probation Department.

We find the government's argument persuasive. In Fair, we held that "a defendant may rely on the PSR to establish his inability to pay a fine or cost of incarceration." Fair, 979 F.2d at 1041. That court noted that when a sentencing court adopts a PSR showing limited or no ability to pay a fine, the government must then come forward with evidence showing that a defendant can, in fact, pay a fine before one can be imposed. Id. The instant matter differs from Fair, however, in that Orozco failed to provide enough financial data to establish his inability to pay in the PSR. The PSR expressly stated that Orozco did not return the Personal Financial Statement he was provided, consequently the probation officer had no information from which to make an assessment of defendant's ability to pay a fine. The trial court acknowledged at sentencing that it could not firmly determine defendant's ability to pay a fine because of insufficient information. Because Orozco failed to establish that he is unable to pay a fine and is unlikely to become able to pay a fine, the trial court did not abuse its discretion by imposing the $25,000 fine and giving Orozco until the end of his pretrial release to pay it. We find no error on the part of the trial court.

## CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court in all respects.